ROBERT WILLS,

      Plaintiff,

v.                                       Case No. 6:18-cv-1194-Orl-37GJK

HOME DEPOT U.S.A., INC.; and
IMPERIAL INDUSTRIAL SUPPLY, CO.,

      Defendants.
_____

## ORDER

Before the Court is Defendants Home Depot U.S.A, Inc. ("**Home Depot**") and

Imperial Industrial Supply Co.'s ("**Imperial**") Motion for Dismissal or, Alternatively, for

Other Sanctions, for Spoliation of Evidence. (Doc. 38 ("**Motion**").) On referral, U.S.

Magistrate Judge Gregory J. Kelly recommends denying the Motion. (Doc. 50 ("**R&R**").)

Defendants objected to the R&R (Doc. 57 ("**Objections**")), and Plaintiff responded

(Doc. 59). On de novo review, the Objections are due to be overruled in part, the R&R

adopted in part, and the Motion denied.

## I.    BACKGROUND

This products liability action stems from a generator fire involving Plaintiff's

DuroMax XP 10000 E generator—manufactured by Imperial and distributed by Home

Depot—which caused serious and permanent injuries to Plaintiff. (*See* Doc. 24.)

According to Plaintiff, he used the generator to provide backup power for various devices

in his home after he lost power due to Hurricane Irma. (Doc. 40-1, p. 90:15–24.[1]) On September 15, 2017 around lunchtime, Plaintiff was watching television on his couch when he heard a "weird noise" and noticed his lights dimming. (*Id.* at 8:19–24, 88:15–22, 90:11–14.) He went to the garage where the generator was located to see what was happening, and he observed the muffler on the generator broken and "flapping underneath the fuel tank." (*Id.* at 88:22–89:1.) On seeing this, Plaintiff shut off the generator's breaker, at which point the gas cap on the generator "blew off" and Plaintiff was "showered" in gasoline. (*Id.* at 89:1–4.) Plaintiff then attempted to shut down the generator; he "turned off the key switch . . . saw an orange spark, and . . . went up in flames." (*Id.* at 89:4–7.) From the fire, Plaintiff suffered severe burns on his back, arm, hand, and foot, and he spent over three weeks in the hospital undergoing multiple surgeries to address the burns. (*Id.* at 117:1–123:8; Doc. 38, p. 46.)

The Lakeland Fire Department arrived at Plaintiff's residence shortly after the incident. (*See* Doc. 38, pp. 37–43 ("**Incident Report**").) The Incident Report reveals that firefighters unplugged the generator and moved it outside the garage. (*Id.* at 41, 42.) While they were moving it, fuel was spilling out of the generator, so they put the fuel cap on the fuel tank. (*Id.*; *see also* Doc. 44-1, p. 9; Doc. 59-3, p. 57:3–13.) The Incident Report doesn't state where the fuel cap was located before the firefighters placed it on the generator. (Doc. 38, pp. 37–43; Doc. 40-2, p. 5; Doc. 59-3, p. 57:16–18.) Further, the Incident

---

[1] The page numbers for citations to Plaintiff's deposition (Doc. 40-1) and the other depositions cited are those from the top right-hand corner of the deposition transcripts rather than those associated with the document number at the top of the page.

Report notes a "melted gasoline container made of plastic was . . . on the front lawn" and "an access cover for the generator" was inside the garage. (Doc. 38, pp. 41, 42; Doc. 40-2, p. 5.) According to the Incident Report, "[i]t was determined the fire was accidentally caused by the ignition of gasoline vapors while the occupant was working on the generator while smoking a cigarette." (Doc. 38, pp. 42–43.) The Lakeland Fire Department also took photographs of the scene and the generator—the gas cap is in place and the front panel is off.[2] (*See, e.g.*, 40-2, p. 21; Doc. 40-4.)

During Plaintiff's hospitalization, the generator was stored in his garage. (Doc. 40-1, p. 81:16–21.) After he was released, his lawyer picked up the generator. (*Id.* at 81:22–82:7.) According to Plaintiff, he never touched the generator after the accident; nor did any of his family members who had access to it other than his son-in-law, who brought the generator back into the garage after the incident. (*Id.* at 82:8–83:10.) Further, Plaintiff did not know where his counsel took the generator and did not have access to it after that point. (*Id.* at 83:16–24.) According to his lawyer, when he picked up the generator, "the generator's gas cap was not present and the generator's front panel was attached to the generator." (Doc. 40-3, ¶ 5.)

Two months later, on November 15, 2017, Defendants' counsel requested the

_____

[2] From these photographs, Defendants' expert found, "the fuel cap displayed thermal damage more specifically described as thermally deformed on the upper portion of the cap. The significance to this observed damage is that the cap had to be in proximity of the incident when the fire ensued for this damage to have occurred." (Doc. 44-1, p. 10.) Additionally, according to the fire department's investigator, "the fuel tank cap had evidence of 'clean burn' which indicated that fire was on the cap for a relatively long time." (*See* Doc. 40-2, p. 5.)

generator be preserved and an inspection scheduled. (Doc. 38, pp. 48–49.) Plaintiff's counsel confirmed the generator was preserved (*id.* at 48), and the inspection took place on April 5, 2018 (*see* Doc. 40-2, p. 4). During the inspection, the gas cap was not on the generator or otherwise available and the front panel was attached to the generator's frame. (Doc. 40-2, pp. 4, 11–20; Doc. 44-1, pp. 5, 16–21; *see also* Doc. 40-4.) On inspection, the generator had smoke and fire damage, including a small liquid fuel pattern at the top of the fuel tank and under the top panels. (*See* Doc. 40-2, p. 4.) Beyond that, "[t]he threads of the fuel tank cap opening [we]re sooted and there [wa]s indication that fire burned near the opening for a short period of time." (*Id.*)

Plaintiff sued in state court on June 13, 2018, and he amended his complaint to name Home Depot, Imperial, and a Home Depot store manager. (*See* Docs. 1, 2, 16, 16-1.) Defendants removed the case here, and the complaint was amended to remove the store manager. (Docs. 1, 16; Doc. 24 ("**Second Amended Complaint**").) According to the Second Amended Complaint, the generator suffered these defects:

    a.    The Generator and its component parts were designed in such a way that rendered the Generator unreasonably prone to exploding and catching fire during its intended or foreseeable use.

    b.    The Generator and its component parts were manufactured using inferior and substandard materials and processes, which caused the Generator to explode and catch fire during its intended or foreseeable use.

    c.    The Generator did not come with adequate warnings and instructions advising consumers and users about the proper use of the Generator, about the Generator's defective condition(s), and about how to avoid being injured by the Generator's defects.

    d.    Defendants failed to adequately test, inspect, and ensure the quality

of the Generator and its component parts prior to placing the
Generator into the stream of commerce.

(Doc. 24, ¶ 33.) From this, Plaintiff raised claims of: (1) strict liability; (2) negligence; (3)

breach of implied warranty of merchantability; and (4) breach of implied warranty of

fitness for a particular purpose. (*Id.* ¶¶ 53–115.)

During discovery, Plaintiff produced photographs of the scene taken by the

Lakeland Fire Department on the date of the incident. (*See* Doc. 40-4.) When confronted

with the discrepancies between the photographs and the condition of the generator at the

inspection, Plaintiff originally testified that the generator was in the same condition when

his attorneys picked it up as in the photographs taken on the day of the incident but later

could not recall because "it was so long ago." (Doc. 40-1, pp. 87:16–88:1.) Plaintiff also

could not explain how the front panel was reinstalled on the generator or recall whether

it was installed when his counsel picked up the generator. (*Id.* at 85:9–17, 85:22–86:4.)

However, he said the panel was on the generator at the time of the incident and that he

performed no maintenance on the generator while it was in his home, including

removing any parts. (*Id.* at 86:1–12, 105:7–9.) Plaintiff also said the fuel cap couldn't be

found after the incident, so there was no fuel cap when his attorneys picked it up. (*Id.* at

87:12–15.) But he maintained he wasn't filling up the generator with gasoline at the time

of the incident. (*Id.* at 103:1–8.)

Further, Plaintiff's experts prepared a joint expert report regarding the incident.[3]

---

[3] The Expert Report also addresses the discrepancies between the generator at the
time of the inspection and the generator as it appears in photographs from immediately
following the incident:

(Doc. 40-2 ("**Expert Report**").) The Expert Report says the generator's muffler mounting brackets could not withstand vibration during normal use and failed, causing the muffler's inlet tube to detach from the muffler and direct hot gasoline exhaust fumes at the generator's fuel tank. (Doc. 40-2, pp. 6–7, 9.) These hot fumes then caused the fuel tank's vent fitting to fail and the gasoline inside the fuel tank to pressurize. (*Id.* at 7, 9.) From this, either the fuel tank's vent fitting, gas cap, or both failed, resulting in Plaintiff being covered in gasoline. (*Id.*) Then, when Plaintiff turned the generator off, a spark from the engine ignited the gasoline. (*Id.*) Ultimately, they opined that "[t]he fatigue failure of the muffler brackets of the generator led to the conditions under which this fire occurred. But for that failure, this fire would likely not have occurred." (*Id.* at 8.)

On April 5, 2019, Defendants moved for dismissal or other sanctions based on Plaintiff's purported spoliation of evidence, specifically the generator's front panel and the missing gas gap. (Doc. 38.) Plaintiff countered that the Motion should be denied because: (1) Defendants failed to comply with Local Rule 3.01(g); and (2) spoliation

---

The condition of the generator in the Fire Investigation photos is not the same as it was at the time of my inspection. In the Fire Investigation photos, a panel was removed from the front of the generator and a wire was wrapped around the generator frame leading to the generator. The fuel tank cap was present. At the time of my inspection, the panel had been reinstalled, the wire was not in place, and the fuel tank cap was not with the generator.

(Doc. 40-2, p. 8.) The Expert Report also states that "[t]here were no photographs made of the generator fuel tank cap threads. The condition of these threads may indicate more closely how the fuel was vented for the tank during the fire." (*Id.*)

sanctions are unwarranted because there is no evidence of bad faith and the gas cap and front panel are not crucial to any party's case. (Doc 40.)

On referral, Magistrate Judge Kelly recommends denying the Motion. (Doc. 50.) Specifically, Magistrate Judge Kelly found: (1) Local Rule 3.01(g) is inapplicable as the Motion seeks involuntary dismissal of the action; (2) Defendants failed to establish a necessary element for spoliation sanctions—the gas cap is critical to their ability to prove a particular defense or to causation; and (3) even had Defendants shown spoliation sanctions were warranted, two of the requested sanctions require a finding of bad faith, which Defendants failed to establish. (*Id.* at 3–6.) He concluded Defendants are not entitled to any sanctions for spoliation of evidence. (*See id.* at 6.)

Defendants objected to the R&R, contesting Magistrate Judge Kelly's findings regarding Defendants' failure to establish the gas cap is critical to the ability to prove a particular defense and to establish bad faith. (Doc. 57.) With Plaintiff's response (Doc. 59), the matter is ripe.

## II. LEGAL STANDARDS

When a party objects to a magistrate judge's findings on a dispositive matter, the district court must "make a de novo determination of those portions of the report . . . to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3). "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988). The district court "may accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). The district court must consider the record and factual issues based on the record independent of the magistrate judge's report. *Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507, 513 (11th Cir. 1990).

### III.    ANALYSIS

Defendants object to the R&R's conclusions that: (1) Defendants failed to link the gas cap to a particular defense; (2) Defendants failed to establish the gas cap is critical to Defendants' ability to prove a particular defense; and (3) Defendants failed to establish bad faith. (Doc. 57, pp. 4–11.) Defendants also object to the R&R's failure to address Defendants' request for exclusion of expert testimony as a sanction. (*Id.* at 11.) On de novo review, the Court overrules Defendants' Objections in part and concludes no spoliation sanctions are warranted here.

"[F]ederal law governs the imposition of sanctions for failure to preserve evidence in a diversity suit." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005).[4] While federal law governs, Florida law is instructive. *See id.* Under Florida law, to impose sanctions for spoliation, the movant must establish three elements: (1) the evidence must have existed; (2) the spoliator owed a duty to preserve the evidence; and (3) the evidence was critical to the moving party's ability to prove its prima facie case or a defense. *Landry v. Charlotte Motor Cars, LLC*, 226 So. 3d 1053, 1056 n.5 (Fla. 2d DCA 2017). Further, for

---

[4] "[E]ven though the *Flury* [opinion] relies on Georgia law, *Flury* explicates the principles of federal spoliation law in this circuit." *Austrum v. Fed. Cleaning Contractors, Inc.*, 149 F. Supp. 3d 1343, 1349 (S.D. Fla. 2016).

imposing sanctions of adverse jury instructions or dismissal, the movant must show evidence of bad faith. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009); *see also Flury*, 427 F.3d at 944.[5] Although malice isn't necessary to show bad faith, mere negligence is not enough. *Mann*, 588 F.3d at 1310.

Defendants first two objections stem from the R&R's conclusions that Defendants failed to link the gas cap to a particular defense and to prove the gas cap is critical to prove a particular defense. (*See* Doc. 57, pp. 4–9.) Defendants maintain they have adequately established the gas cap is critical to their proximate causation defense because it could provide evidence to rebut Plaintiff's version of events and his experts' opinions. (*Id.* at 6–9.) Magistrate Judge Kelly rejected this argument and agreed with Plaintiff that other substantial evidence exists related to proximate causation—the generator, the mating threads for the gas cap, Plaintiff's account of what occurred, photographs of the generator from the incident, and the firefighters' observations—so the gas cap is not critical. (Doc. 50, p. 5.) From this, Magistrate Judge Kelly found, "While the gas cap may be relevant to determining proximate cause, in this case it does not appear to be critical to that issue." (*Id.*) On de novo review, the Court agrees.

A necessary element for spoliation sanctions is that the evidence is crucial to the movant's case. *Cerrato v. Nutribullet, LLC*, No. 8:16-cv-3077-T-24 JSS, 2017 WL 5149206, at *2 (M.D. Fla. Nov. 6, 2017). To make this showing, "it is not enough that the spoliated

---

[5] Spoliation sanctions include "(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." *Flury*, 427 F.3d at 945.

evidence would have been relevant to a claim or defense." *QBE Ins. Corp. v. Jorda Enters., Inc.*, 280 F.R.D. 694, 696 (S.D. Fla. 2012). Also, "[e]vidence is not crucial if it is available from an alternate source or if the claim or defense to which it relates is adequately supported by alternate evidence." *United States ex. rel. King v. DSE, Inc.*, No. 8:08-cv-2416-T-23EAJ, 2013 WL 610531, at *8 (M.D. Fla. Jan. 27, 2013). Rather, evidence is crucial "when it goes to the heart of a party's ability to prove its claim or defense." *Kimbrough v. City of Cocoa*, No. 6:05-cv-471-Orl-31KRS, 2006 WL 3500873, at *5 (M.D. Fla. Dec. 4, 2006). So, "spoliated evidence must be so crucial as to completely prevent the movant from defending itself, not merely prevent the movant from defending itself completely." *Landry*, 226 So. 3d at 1058.

Here, it is undisputed that the gas cap relates to the proximate cause inquiry, but Defendants have failed to show it constitutes "crucial" evidence for the proximate causation defense. Specifically, Defendants contend the lack of the gas cap—and evidence of any damage to the gas cap threads—prejudices Defendants' ability to refute Plaintiff's testimony and his experts' findings that the gas tank became pressurized, the gas cap blew off, and Plaintiff was not refueling the generator at the time of the incident. (Doc. 57, pp. 7–8.) Further, Defendants assert no substantial evidence exists as an alternative for the gas cap because there is no other evidence of the condition of the gas cap threads. (*Id.* at 9.) But this does not prevent Defendants from defending themselves completely on proximate causation.[6]

---

[6] Notably, while Defendants' Objections expand upon the alleged necessity of the gas cap as it relates to Plaintiff's version of events and his experts' report (Doc. 57, pp. 5–

While the gas cap—particularly the condition of its threads—could be evidence to refute Plaintiff's version of events and the Expert Report's findings,[7] other evidence exists that Defendants could use for this purpose. For example, the generator itself, coupled with photographs of the generator on the date of the incident, offers evidence of proximate causation based on where the fire damage appears on the generator. (*See* Doc. 40-4; Doc. 40-2, pp. 4, 21; Doc. 44-1, pp. 5–8, 10; Doc. 57-2, p. 90:21–24; Doc. 59-3, pp. 37:2–6, 40:5–7, 46:1–6.) More specific to Defendants' defense, the mating threads on the generator's fuel tank could provide evidence of whether the gas cap was in place at the time of the incident and whether it blew off. (*See* Doc. 40-2, pp. 4, 15; Doc. 44-1, pp. 4–7, 12, 17; Doc. 57-1, pp. 28:15–29:7.) The same is true of the photographs from the incident that show the gas cap, albeit not the threads, and reveal fire damage to and the resulting condition of the gas cap. (*See* Doc. 40-4; Doc. 40-2, p. 5; Doc. 44-1, p. 10; Doc. 59-3, pp. 57:1–58:11, 86:3–8.) Both Plaintiff's and Defendants' experts discuss the condition of the generator and mating threads and the photographs of the gas cap to conclude on

_____

9), the Motion stated only that "without access to [the gas cap], Defendants cannot properly defend against the Plaintiff's allegations of proximate cause or his version of events" and that "being able to examine the gas cap and determine if it in fact 'blew off' as alleged by Plaintiff is central to defending against the claims of the Plaintiff" (Doc. 38, p. 12).

[7] Both Plaintiff's experts and Defendants' experts stated the condition of the gas cap threads could provide evidence as to what happened during the incident. For example, Plaintiff's experts state that the condition of the gas cap threads could show "how the fuel was vented [from] the tank during the fire"—whether Plaintiff was sprayed with gasoline from the fuel tank's vent fitting, from the gas cap, or both. (*See* Doc. 40-2, p. 8.) One of Defendants' experts testified that he was "at a little bit of a[ ] disadvantage" without the gas cap for purposes of determining whether the gas cap was on at the time of the incident and whether it blew off. (Doc. 57-2, p. 90:3–18.)

causation and on whether the evidence supports Plaintiff's version of events. (*See, e.g.*, Doc. 40-2, pp. 4–5, 6–8; Doc. 44-1, pp. 5–6, 9–10; Doc. 57-1, pp. 28:15–29:7; Doc. 57-2, p. 90:21–24; Doc. 59-3, pp. 38:13–23, 46:1–49:17, 57:1–59:18, 86:3–8, 91:3–24.) Further, Defendants have Plaintiff's version of the incident, two witnesses' accounts of the events following the incident, and the firefighters' observations of the scene, summaries of Plaintiff's statements about the incident, and conclusions about the fire's cause following their investigation. (*See, e.g.*, Doc. 38, pp. 37–47; Doc. 40-1; Doc. 40-2, pp. 21–22; Doc. 40-4; Doc. 59-1; Doc. 59-2.) Even without the gas cap or evidence on the condition of its threads, other evidence exists to challenge the veracity of Plaintiff's assertions and the Expert Report's findings that Plaintiff was not refueling the generator at the time of the incident and that the gas tank became pressured and the gas cap blew off during the incident. *Cf. United States ex. rel. King*, 2013 WL 610531, at *8 ("Evidence is not crucial if it is available from an alternate source or if the claim or defense to which it relates is adequately supported by alternate evidence.").

What's more, the crux of the Expert Report on the cause of the incident does not center on the gas cap. (Doc. 40-2, pp. 2–9.) Rather, the Expert Report states that the fire was caused by a defect in the generator's muffler mounting brackets. (*See id*.) Specifically, the muffler mounting brackets broke due to premature fatigue, which directed hot fumes toward the generator's fuel tank, pressurized the gasoline in the fuel tank, and resulted in either the fuel tank's vent fitting and/or gas cap to fail and spray Plaintiff with gasoline. (*Id*. at 6–9.) Then, a spark from the engine ignited that gasoline. (*Id*. at 7, 9.) With that, Plaintiff doesn't contend the gas cap was defective nor that the gas cap caused the

incident—defective muffler mounting brackets were the cause. (*Id.* at 6–9.) So the condition of the gas cap threads would not refute the Expert Report's finding that the gas tank became pressurized or its conclusion on causation; the gas cap is not crucial for that purpose. As Magistrate Judge Kelly concluded, "[w]hile the gas cap may be relevant to determining proximate cause, in this case it does not appear to be critical to that issue." (Doc. 50, p. 6); *cf. QBE Ins. Corp.*, 280 F.R.D. at 696 (noting that relevance alone is insufficient to warrant spoliation sanctions).

Ultimately, Defendants failed to establish the gas cap is crucial to its proximate causation defense. The gas cap could help Defendants to defend themselves, but the lack of it does not completely prevent them from defending themselves. *Landry v. Charlotte Motor Cars, LLC*, 226 So. 3d 1053, 1058 ("[S]poliated evidence must be so crucial as to completely prevent the movant from defending itself, not merely prevent the movant from defending itself completely."). So the gas cap is not crucial, and spoliation sanctions are unwarranted here. *See, e.g.*, *Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962, at *3 (S.D. Fla. July 23, 2010) (declining to impose spoliation sanctions in part because there was other evidence to prove plaintiff's product defect case, including documentation and reports on the chair's condition at the time of the incident). The Court overrules Defendants' objection to the R&R's conclusion that Defendants failed to establish that the gas cap is crucial to its proximate cause defense.[8]

---

[8] Beyond this, Defendants' continued assertion that the gas cap is crucial to its defense is belied by the delay in raising this issue. Defendants knew about the missing gas cap by April 5, 2018 when the inspection of the generator occurred. (*See* Doc. 38, pp. 4–5.) But they did not notify the Court or Plaintiff of the issue until they filed the Motion

As Defendants failed to establish the elements for spoliation sanctions, the Court need not address Defendants remaining objections to the R&R—that the R&R incorrectly concluded Defendants failed to establish bad faith necessary for certain sanctions and that the R&R failed to address Defendants request for the sanction of exclusion of expert testimony. (*See* Doc. 57, pp. 9–11.) The Motion is denied.

## IV. CONCLUSION

Having conducted an independent, de novo review of the portions of the record to which Defendants objected, the Court agrees with the R&R's finding and conclusion that Defendants failed to establish the necessary elements for imposing spoliation sanctions. Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Objections to Magistrate Judge Kelly's June 25, 2019 Report and Recommendation (Doc. 57) are **OVERRULED IN PART** to the extent the R&R correctly concluded Defendants failed to show spoliation sanctions are warranted.

2. U.S. Magistrate Judge Gregory J. Kelly's Report and Recommendation (Doc. 50) is **ADOPTED IN PART** as to the conclusion Defendants failed to establish the necessary elements for sanctions due to spoliation. That portion of the R&R is **ADOPTED, CONFIRMED,** and made a part of this

---

exactly one year later. (*See* Doc. 38; Doc. 40-3, ¶ 3.) In considering delays in raising spoliation issues, courts have found delays even shorter than this as "undercut[ting]" an assertion that the evidence at issue is crucial to the case. *See, e.g.*, *SE Mech. Servs., Inc. v. Brody*, No. 8:08-CV-1151-T-30EAJ, 2009 WL 2242395, at *3 & n.9 (M.D. Fla. July 24, 2009) (finding that a three-month delay weighed against a finding that the allegedly spoliated evidence was crucial to the case).

Order.

3.    Defendants' Motion for Dismissal or, Alternatively, for Other Sanctions, for

Spoliation of Evidence and Incorporated Memorandum of Law (Doc. 38) is

**DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on September 16, 2019.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record